We will hear argument first in numbers 20, 22, 49, and associated cases. QIAGEN North American Holdings against HandyLab. You should, of course, feel free to, but are not obligated to remove your mask when you're at the lectern. But please, when you're sitting at the table, masks on. Thank you. Good morning, Your Honors. May it please the Court. This Court has repeatedly held that claims are not to be treated as a nose of wax. In criticizing a patentee's effort to interpret claims one way for the purpose of infringement in a different way for the purpose of validity. It should do the same here. In the related district court case, for the purpose of establishing infringement, the patentee HandyLab argued that claim language in these and related patents should be interpreted broadly and repeatedly emphasize the high standard required to narrow claim language through lexicography or disavow. I'm sorry, can you get to the specifics of the particular claim construction at issue here, the multi-lane microfluidic cartridge, using different principles within the quiver of claim construction principles for different claim terms. It's commonplace, so you've got to get to the specifics. Absolutely. And I would note, for Your Honors, I understand these specifics, but in the district court case, HandyLab specifically argued that a clause at the end of the summary of the invention meant that the following detailed description meant that those embodiments were not limiting on the claims. And that same clause occurs in the 708 patent and the 900 patent that are at issue here. But as far as the specifics, the board made two errors, and the first was to require that each lane of the multi-lane microfluidic cartridge have both a microfluidic network and an inlet. And the board did that based on a sentence in the specification that the board concluded, quote, defines the structure of the sample lane, close quote. That sentence that the board relied on is not definitional. It was not describing, quote, unquote, the invention, nor was it phrased in definitional terms. In addition, the sentence that the board relied on was in column 13 of the, and I'm citing from the 708 patent, but they have the same specifications, and that's at Appendix 270. But later in that same column, column 13, the specification actually describes the components that are part of a lane in different and broader ways. In particular, it says that a lane of a multi-lane cartridge comprises simply a microfluidic network. I'm sorry, the word simply, is that in there? No. It isn't there. Well, isn't that the critical thing? One sentence says it has to have A and B. The next sentence says it has to have, you know, A, B, and C. So those are not inconsistent, unless there was a word like simply or only or merely in there, which there isn't. I think the problem for HandyLab here is that the specification describes a lane in different ways, one broader and one narrower. And HandyLab is taking the position that the narrower description should control here. And the end conclusion is that you're trying to argue that the lane doesn't need an inlet. Correct. I mean, that's preposterous. How's the fluid going to get into the lane? That is a fair point. Is it going to come through the back door? That is a fair point, and I think... I thought your reply brief almost conceded as much. I think the issue here... That you have to be able to get the fluid into the lane. Absolutely, Your Honor. And so how are you going to get it into the lane if the claim doesn't have an inlet? I think the issue here, Your Honor, is how the board subsequently interpreted inlet. If the term inlet simply has this plain and ordinary meaning, and that, you know, it's where the... Is this your best argument? I mean, you ordinarily lead with your best argument. Did you want to upset what the board did here? I think... I mean, you're using a lot of time on this. Sure. So I think... I mean, you have an alternative holding here that there's no reasonable expectation of success in accommodation. And that's a fact question. It comes to us on substantial evidence review. The board rejected your expert. The board said Dr. Northrup and the other expert are looking at two different... I mean, there's night and day between those two experts and what they see as the problems with combination. How can we not accept that conclusion on the standard of review? Sure. If I may answer your first question first, and then I'll proceed to the reasonable expectation of success issue. So on the issue of inlets, if the inlet has its ordinary meaning, I think we would agree that a lane, of course, has to have an inlet. That's a way... The fluid has to get in there somehow. The problem is that the board then further limited the term inlet to specifically a structure that is a hole on the exterior of the cartridge. So there had to be a hole in the exterior of the cartridge associated with each lane. And that is not what the specification requires. And that can be seen in particular, again, in column 13, where there's the sentence the board relies on that says an inlet... I'm sorry, a sample lane comprises a sample inlet and a microfluidic network. Then the very next sentence says a sample lane can include a sample inlet port or valve. So everybody agrees that a sample inlet port is an optional feature. And Candy Love tries... So what if there's some error in the claim construction? The board, in its reasonable expectation of success analysis, was assuming, arguendo, that you were going to credit and have ZOO would be part of the mix. And so I didn't see anywhere in your brief you pointed out to me why the reasonable expectation of success conclusion was infected or reversibly undermined by any errors in claim construction. Your Honor, I believe we do point that out in the briefing. I believe it's in the blue brief around pages 53. You say typically if a claim construction error, you expect to have a vacate and remand, but you don't explain to me why it's necessary here because the board's reasonable expectation of success analysis in its entirety didn't depend on these errors that you find in the claim construction. I didn't see it that way. Respectfully, Your Honor, their conclusion did depend on their erroneous claim construction. In what specific regard? Sure. So in several specific regards. So they started their analysis of reasonable expectation of success looking at this combination with the understanding that the ZOO reference would have to be modified to have separate inlet ports for each of those microfluidic network lanes. So once they started with that understanding, they then continued to analyze, okay, how could that be combined? Could you walk me through the board analysis where they're starting with that proposition? Sure. So I think if you go ahead. So I can sort of follow along where you are. There are two decisions here that are essentially the same as their two patents. So I would refer you to the decision for the 708 patent. And which page were you in there? Excuse me, that would be appendix, starting around appendix 37. 37? Correct. This is the state-of-the-art discussion. Correct. There's a very difference of opinion between Northrop and your witness on what the state-of-the-art was. Correct. And if I could, Your Honor, I would point you to several specific... I'm assuming for purposes of this argument that the 1030 exhibit was properly excluded. I'm assuming for purposes of this discussion we're having that you're not going to come in and say, well, there's a lot of stuff that was in the 1030 that bears on reasonable expectation of success. I absolutely think there was a lot. I know you were, but I'm asking you to pretend in your mind as if that's not the case. Understood. Walk through. I think we're beginning to tell us where the board, in your view, in the reasonable expectation analysis, says what we think is unexpectedly difficult is getting to a system in which each lane can simultaneously have physically different samples. Right? Which is, I think, your point about how this analysis depends on the claim construction. Show us where you think the board makes that dependency. Absolutely. I think some examples occur on page 37. For example, the board's reliance on purported challenges with contamination and also the, quote, design and configuration of the microfluidic network. I think it's clear from the board's opinion that they were operating under the assumption that the design and configuration of Zao's microfluidic network would have to be substantially and materially changed in order to provide the claim element. I think it's also apparent in the board's discussion of challenges with interfacing, interfacing the Zao. Pages, pages, pages. I'm sorry. Still on page 37. Okay. Functionally interfacing the reaction instrument with control machinery, which is in the middle of 37. Is that what you're referring to? Correct. That's what I'm referring to. What does that have to do with the claim construction? My understanding is what the board is doing here is saying, okay, you have a certain kind of layout or design in Zao, but that's on a chip, and it's not so simple to transfer that layout design onto a cartridge that would then be popped into a machine so that a detector could then see and do all of the detection of the PCR reactions going on in all the different lanes. And then also at the same time, you know, have all the temperature controls and temperature uniformity across all the lanes. Sure. And I think a couple responses to that. One is on the temperature uniformity and the temperature control. That's what the Zao reference was all about. The Zao reference did that, solved those problems. For that chip inside that particular contraption, now the question is how can you so easily lift that out and put it into this other context, which is the claimed context. And that was the question that Dr. Northrop said there. It was actually not so straightforward. It was pretty tricky, pretty complex. Sure. And I think that gets to a separate error in the board's analysis, which is that it did require us to show this bodily incorporation. How would each reference be physically changed in order to match, sort of like Legos, with the second reference? And that is clear in the law that that is not proper. But to get back to your earlier point about how does claim construction work into this situation, I think another example is on Appendix 38 where the board rejected Kaijin's expert opinion that the combination would just be the Zao microfluidic unit virtually unaltered, at most with just a very basic plastic housing. And the board rejected that. And that was, in large part, due to their mistaken understanding of what the claims required and their understanding that Zao would have to be made more complex with these different inlet ports and a different microfluidic network configuration in order to successfully interface with the secondary reference. Where do you think the board says... What particular material on 38 are you relying on for tying the claim construction to this point about what a skilled artisan would have to do with Zao? So I'm on the bottom of page 38 where... This is the we also find sentence? Correct. But that doesn't refer to modifying it to make it possible for the lanes to concurrently have different fluids in it. It doesn't refer to that specifically, but that is the foundation that the board built its analysis on. And that's a large part of why the board concluded that this overall area was complex and difficult. It didn't look at the specific combination, which had these references that had solutions for these problems, and it was operating under the incorrect understanding that the Zao reference would have to be materially redone, altered, with this new port configuration that would then have to be interfaced with these systems. We give you almost a rebuttal time. We will restore the full five minutes unless you want to keep going. I will take the full five minutes. Thank you, Your Honor. Mr. Saunders. Morning. May it please the Court. If I could speak to this question. I think we have two independent grounds being given by the board. First, it's finding that we're missing a claim limitation, the multi-lane limitation, based on its claim construction. And then independently of that, its analysis found the lack of a reasonable expectation of success. And the pages that we were just looking at in the final written decision don't blur those two together. They're not talking about we're having to make modifications to get to the... Except contamination? There's one reference to contamination, but that I think relates back to Dr. Northrup's testimony about if you're putting the chip inside the cartridge, so you no longer have the direct access to the sample inlet, then you have to figure out where is that in the cartridge, and how does it interface... Point me to the record citation for that testimony, would you please? For Dr. Northrup. Thank you. Okay. So relevant portions of his declaration are starting at 3078 of the appendix. 3078? 3078. This is the material that the board cited when it was referring to contamination, which is... Right. I mean, the discussion of contamination is in a longer sentence there, but he had talked about the difficulty... Which paragraph on 3078? Well, 777, he talked about the packaging and finding the proper interface. There then was the discussion... Integrating, assuring, achieving temperature, separate heating, I'm just looking for contamination. I don't think he specifically is using the word contamination when he's talking about the... So what words is he using that we would equate to... The words that correspond here for this section of the declaration are talking about the packaging and finding the proper interface. So it's when you're packaging the chip inside... What's that have to do with contamination? Because when you're packaging the chip inside the larger cartridge, you have to figure out the way that you're going to interface. How are you getting the fluid to that chip? And then, you know, we also have the issue separately then on the claim construction, the problem with the zoo chip itself and the contamination there, it not being multilayered. So I think when you look at sort of... There's that one reference to contamination. The discussion that follows is focusing on the difficulties with the heating systems. I mean, this is a much broader discussion. Classic substantial evidence review, one expert versus the other expert, where our expert's testimony was credited by the board and provides the substantial evidence to support the opinion. Well, I was looking at... If you look at 3502, we're talking here about your guy Northrop and what he's saying about contamination. At 3501, 3502, Northrop is actually talking about contamination. In fact, paragraph D says contamination on page 15, and this is of his expert declaration. Yes, thank you very much. Yeah, so it is. So he's talking about the kind of contamination, cross-contamination, the inadvertent mixing of two different samples. So that's a problem that would come if we were construing the claim to be capable of or drawn to a capability of using different kinds of samples simultaneously. Yes, contamination is a concern. That kind of contamination is related to the claim construction issue. That type of contamination would be related to the claim construction issue. Now, he then goes on to say and or unintentional introduction of foreign DNA. Now, that can happen, can't it, if you're just using one thing? Sorry, if you're just using one. Is there a possibility that in Reservoir 7, for example, in ZOO, you could have some unintentional foreign DNA in the common sample? You're absolutely right. Generally, there's a contamination problem whether you are using different kinds of samples or the same sample? Right, because one of the discussions of that was ZOO being used in a serial fashion? What I'm trying to get you to tell me is whether when the word and or is used by your expert, is he talking now about a situation in which he would not be using two different samples but be using the same sample? Well, I think that it would relate to... When you focus specifically on the problem of contamination, the concern is some other DNA getting in there. Usually, that would be when you're doing different samples. There's always issues in the lab, too, with unintentional contamination. Would you agree that when we're talking about what your expert was saying about contamination and about the interrelationship of contamination to a claim construction issue is your earlier reference to page 307, paragraph 7, 7, overwhelmed by what we pointed out at 3501? You earlier were telling me that I should read what the board was thinking about contamination being what you cited in paragraph 377. Right. I think it could well be this part of his declaration. I apologize if I'm taking you to the incorrect page here. The citation that I point to is far more specific. That is far more specific about contamination and I think what I realize is when you read... Let me ask you this question. Assume, for purposes of argument, I was troubled by the board's reading these claims as being drawn to a capability to receive multiple different types of samples. Assume I was troubled by that. And consequently, I would be troubled by the board relying on contamination as a ground for finding no reasonable expectation of success. Would it be your argument that even if that was errored by the board, there is sufficient additional evidence that the board pointed to to support its conclusion that there was no reasonable expectation of success? Absolutely. To answer the second point directly... Why don't you walk me through the evidence that's of record that basically is coming from Northrop in opposition to the other data points in the analysis of the reasonable expectation of success that would support it, notwithstanding a concern that the court might have with the contamination issue. Right. So if we look at page 37 of the appendix, contamination is mentioned as just one part of a much longer list. The very next sentence, the board specifically finds that Northrop provides factual support in reference to numerous contemporaneous publications. They find that he persuasively explains there were each... If you see where I am on page 37, I'm not going to read it all, but the focus here is on the complexity of putting these together with a particular focus on the uniform temperature, optical detection, and multiple reaction chambers. Let me ask you another question. Go ahead. And the citation there is to paragraph 39, which is under interfacing, not under contamination. Correct. And then they go on and talk about, with reference to the particular challenges, and they cite paragraph 771 through 786, which I think of as sort of the biggest block of his analysis. And that's where he talks about these challenges with the heating, the difficulty of maintaining that uniformity when you're putting this into a larger system. The point I wanted to make is that the aspects from Dr. Northrop's testimony that are alluded to or that are specifically identified on page 37 are fewer in number than the total number of reasons why Dr. Northrop in his declaration found no reasonable expectation of success in the combination. I went back and made several additional points that were made by Dr. Northrop that are not referenced in the board opinion. When the board says that they credit the testimony because of the particular challenges listed above, does that mean they only credit the portions of Dr. Northrop's testimony that are relevant to the references cited in page 37, or is the board essentially saying we buy all of Northrop? I understood that they were buying all of Northrop, but if you look at that 771 through 786, I need to know how I'm supposed to read the clause because of the particular challenges listed above? Well, I think if you look at just the immediately preceding sentence, which is talking about the optical detection uniform temperature, those are the points. There's a citation. Things get addressed multiple times in the declaration, so the citation in paragraph 39 of the declaration, the 771 through 786 cycles back through all of those concerns as well. There are additional things he talks about, like the fragility of the beams, that the board doesn't specifically call out in its decision, but at a minimum, those concerns, whether the optical detection uniform temperature would be enough. If I may, back up to the premise of this and the claim construction issue, what's giving you concern here, we have a multi-lane cartridge, and so there are going to be multiple lanes, and the question is, well, what is a lane? And the specification in column 12 to 13 tells us exactly what a lane is, and it has to have a sample inlet. If you look throughout the specification, there's not a single example anywhere in the specification of a common sample inlet. The point is that each lane has to have an inlet, and one would grant you that, and the definition of an inlet is the place where the fluid goes into the diagnostic chamber, and that seemed to me no one would disagree with that, but to go further and to say the entry into the diagnostic chamber has to be on the outside of the physical structure seemed to me to be quite a reach. Well, no, I mean, that is the way the board was looking at it. But that seemed to me to be an unnecessary reach, and certainly one that the patentee wouldn't want to be stuck with in litigation because you can design a structure where there's a housing that holds the whole thing, but that the lane in the diagnostic chamber is inside the housing, and that the place where the juice goes into the diagnostic chamber is inside, inside the housing, and on the claim construction from the board, the port has to be on the outside of the building, so to speak. Right, but if it's a single lane, if they're connecting it through, then the inlet would be the one that is on the exterior. We are fine with that construction. That is what the benefit we're getting from this invention is you have the separate sample inlets. Each lane is kept separate, so you have an extreme amount of flexibility in terms of the ability to do different samples. If you have a valve that controls the flow of the fluid into the inlet, and the valve's an off-on valve, so you can shut it off so nothing can get into the diagnostic chamber, that certainly would look like an inlet. No, I disagree. Here we have the board credited Dr. Northrup's testimony. This is at A29 of the appendix about the definition of inlet. Throughout the specification, every single example of inlet in the specification is at that interface between the interior and the exterior of the cartridge. It repeatedly talks about, column 14 talks about the sample inlet when a user introduces a sample into any cartridge. Is the language about the inlet is at the exterior of the cartridge substantively different from saying that a multi-lane cartridge here must have the capability to accept physically different samples in each lane? Are those identical, or is there some daylight between those two things? The latter follows from the former. In other words, the capability to accept the multiple samples, they're not reading that directly into the claim. They're interpreting what the apparatus is. Suppose I thought that I actually could not logically understand what they were saying about inlet apart from the capability. I'm trying to understand. One follows from the other. If you have a separate sample inlet and you have the separate lanes and that inlet's on the exterior, then you are going to have that capability to do multiple samples. The capability flows from... Why is that so? Every lane, let's assume that what you want to do is to run a diagnosis on the same fluid, not different types of fluid, but you want to run more than one test on the fluid. You want to test it for different things. All you need to do is be able to get the fluid into the reaction chambers, right? If that is what you're doing, and the great advance of this, and part of the advance of this invention here is that you have the flexibility to do that, or you have the flexibility... We have that because of three citations in the specification. There's nothing in the drawings that suggests that you can't have a common reservoir. Well, I would put it the other way. There is not a single example anywhere in this patent of a common reservoir. There's no example of any reservoir. Right, every single drawing... So the claim is drawn broadly enough to read on zoo, to read on a common reservoir situation. To get back, I mean... Doesn't it? No, no, absolutely not. Why not? Absolutely not, because it tells you you have the separate sample inlets, you have all of the extrinsic evidence. Every single example in the specification is showing the inlet as the connection at the exterior. But that has nothing to do with what kind of fluid is being put in. Well, it... It has nothing to do with that. It creates the capability... It creates an opportunity... Right. ...for having differing types of fluids put in, but it isn't required. Well, the... Is there any language in the claim that's drawn to capability, FinJAM language? For the... Yes or no? No, the claim itself doesn't speak of capability. The claim defines the apparatus... Right. ...that creates that capability. If you have the separation that's required by the claim, and you have the uniform description of the invention throughout, then you will have that capability. It flows from the claim... Is your claim thus limited to an apparatus that deals with multiple different fluids, so that ZOO would not infringe? No, I think... Why not? It has the capability because it has multi-lane... Yes. ...with separate sample inlets... But is that a claim requirement? Yes, that is a claim requirement. Does that define the scope of your claim? Yes. Your claim is your patent only reads on devices that analyze multiple fluids, multiple different fluids at the same time? Devices that are structured such that they could, or you could introduce the same fluid. You have that flexibility in a way you don't have... I assume you have no problem with the proposition that ZOO does not infringe. Yes, to be clear, ZOO does not infringe. Can I ask you one question? I know we're a little over time, so I think we need to wrap this up. You say that Claim 30 adds something to Claim 1? What? So in Claim 1, the detection is in the PCR reaction zone, and in Claim 30, it's detection in the sample itself. Detection what? In the sample itself. In the sample? Yes, so if you look at Claim 1, the detection... Claim 1 says, quote, to detect the presence of an amplification product in the respective PCR reaction zone. And the language in Claim 30 is talking about detecting the presence of an amplification product in each of the samples. So it's the difference of you've detected it in the chamber. Now, Claim 1 obviously encompasses what you have in the dependent claim. You could be detecting it in the sample while the sample is in the chamber, but that's not strictly required by Claim 1. I must say, until this moment, I had no idea what you thought the difference was between them. Oh, I apologize, Your Honor. No, and this wasn't developed... The claim differentiation argument hadn't been made below, and so it's being developed on appeal. Is there a pending district court litigation? There is a pending district court litigation, yes. And did you take a different position on claim construction for multi-lane microfluidic cartridge? No, multi-lane, it's the same construction. That's the construction that Judge Stark adopted in that case where we're being accused of an alleged inconsistency is on the construction of valve, and the context there is completely different. That's a different patent with a different specification. There you have a specific... The question is, does a valve have to be normally open? There, there's an example of a valve that is, quote, normally closed. Unlike here, where we don't have any treatise, article, anything... That's fine, but I just want to know, did multi-lane microfluidic cartridge get construed in the district court? And if so, is it the exact same construction of the board here? Where the... Here, just to be clear, it's not just having a sample inlet and its own microfluidic network, but it's also the meta construction that the board here did to the term sample inlet. That second level issue... The capacity... Right, the second level issue... Multi-lane handles its own separate and independent sample. That didn't come up as an issue of claim construction in the district court. Quite frankly, it wasn't presented as an issue of claim construction in this case. It is arisen because of the application of the claim construction to ZOO. There hasn't been anything in the district court that's required the court to sort of get into a second level issue like that, but we think that is the correct reading of the claim. There's no inconsistency. Thank you, Mr. Sanders. Just a few brief responding points, Your Honors. First of all, there was some discussion about is there enough evidence on the issue of reasonable expectation of success other than this contamination issue to affirm? And I think the answer, first of all, is no. This issue of contamination and then design and configuration of the microfluidic network, that's something the board focused on, and it's, again, at Appendix 37 where the board kind of summarizes its reasons why it didn't think there was a reasonable expectation of success. Those are two of the primary things listed there, and it's just impossible to kind of get inside the board's head and understand how much that weighed into the board's decision, and I think the only way to kind of fix this error is to remand to the board so that they can do a new analysis using the correct claim construction under the correct understanding of what the structure is that the claims require before you get to the subsequent analysis of, okay, would a person of ordinary skill expect to be able to combine these things using only routine engineering, or is there something kind of more difficult about this? And I think this issue of contamination, that was a very big material issue in the underlying IPR, and you heard counsel say, that's the benefit we're getting from this invention. They focused on this contamination issue to get their claim construction. So it is a core part of this IPR, and it's just impossible to divorce the issue of contamination from what happened in front of the board. Can I just push back a little bit on that just to get clarity? So if a decision maker says, on reasonable expectation of success, there are six challenges that a skilled artisan would have needed to meet with a reasonable expectation of success. I don't see the evidence for reasonable expectation of solving any of the six. Then even if one of them was infected by a misunderstanding, there would still be five challenges for which there would be a finding that the skilled artisan didn't reasonably expect success. That sort of skeleton, that scenario, why is this case not that? Even assuming contamination was a problem. I think this case certainly was not that situation, and that's largely due to the fact that contamination was the primary benefit that HandyLab focused on and emphasized to the board that that is the benefit of this invention and used that to differentiate it from Zao. So the board viewed that as a very important part of the invention. I think beyond that... I think you made in your brief, I'm not sure if I remember this right, maybe a passing reference to the idea that even if we were to reject the claim construction, that even if we thought the reasonable expectation of success conclusion of the board was sound, that there would nevertheless be something to remand? Did you make a suggestion? If so, what did you have in mind? Sure. That goes to this issue with Exhibit 1030. You had asked me earlier to assume that we're not talking about that. I would like to briefly talk about that if that's all right with your honor. I know it wasn't specifically discussed earlier, but we believe that is a core part of the reasonable expectation of success evidence, and it was very clear in the board's decision that they just disregarded that. And I think, you know, I can point your honors, again, Page... But the board said that it wasn't relying on it expressly. Correct. Correct. But the way that it said that made clear that it recognized that that was key material evidence because the sense that precedes that is the petitioner's assertion that using a microfluidic chip, PCR chip, like Zalwan, as a cartridge was routine and predictable by March 2006,  which the petitioner did not submit with the petition. So the board's only response to our evidence that using Zalwan as a cartridge would have been routine and predictable was to say, well, yes, but that's based on Exhibit 1030, so we're not going to consider it. So that was an... That's in the backdrop of the board starting off by saying that your whole expectation of success argument, in their view, was sketchy and was just sort of like chicken scratch in the record in the very beginning, that you hadn't put much effort into making that argument in your petition or in your response. I mean, that's... I mean, that's... I read that to the board to have that in its mind, and that says, then you come in with 1030 late, and we're just not going to let it in as a matter of case management under the rules. That is what... Part of what the board said here, Hunter. And for me, and as is for you as well, I think 1030 is the elephant in the room. Absolutely, and... The case is demonstrably weaker without it. And I think the board's conclusion that you referenced, that the reasonable expectation of success was conclusory, is just not supported. The board focused very myopically on how many times Kaidan used the phrase reasonable expectation of success, and it ignored the other evidence that Kaidan provided and submitted that showed a reasonable expectation of success. And we talk about some of that in our briefing. And a couple specific points of evidence. The Zao reference itself said, my device can be used with current macro thermocyclers that exist in the air. So it taught that its device, its multi-lane device, was intended to be used with other systems. Uh... That wouldn't quite establish that a skilled artisan would actually be able to do it, would it? All by itself. We intend this, lots of intents around the world. What it shows is that this, you know, the way of using something like Zao with another system was just routine engineering. That's what that statement shows. And we also cited other evidence, for example, the fact that... That was routine? I'm sorry? Routine? That combination would be routine? Yes, absolutely. Is that word in Zao? Oh, that's not in Zao, but the other evidence in the record shows that. The board didn't disregard any other evidence, did it? It largely did because of its mistaken conclusion that we didn't put enough evidence of reasonable expectation of success in the petition. And that conclusion, by the way, I think... I thought it went on to address that evidence anyway. It addressed some of it, but critically, it did not address Exhibit 1030. Also, it did not address one of our primary, secondary references was Puramadi. And Puramadi expressly taught, here's some ways you can put a microfluidic chip into a cartridge. It said you can glue it, you can carve out a recess and then clamp it in there. And the board just ignored that. And I think the board's conclusion that we didn't put enough reasonable expectation of success evidence in the petition, it was all the more unfair because the board instituted review in this IPR over HandyLab's objections that reasonable expectation of success evidence was conclusory. And it invited the parties to further brief the issue, to develop the record. And then when Kaijin tried to do that, the board then effectively reversed its decision on that same claim and just disregarded key reply evidence. There comes a time in every argument where we have to call a halt  Thank you. Thanks. Thank you.